UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

FORT MYERS DIVISION

Case No: _____

RABEL BAJWA,

     Plaintiff,

v.

PRIME HEALTHCARE SERVICES-LEHIGH ACRES, LLC
d/b/a LEHIGH REGIONAL MEDICAL CENTER

     Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, RABEL BAJWA, by and through her undersigned counsel, sues the Defendant, PRIME HEALTHCARE SERVICES-LEHIGH ACRES, LLC d/b/a LEHIGH REGIONAL MEDICAL CENTER, and alleges as follows:

## JURISDICTION AND VENUE

1.    This is an action for damages and to remedy violations of the rights of MS. BAJWA under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and the Florida Civil Rights Act of 1992, as amended ("Chapter 760" or "FCRA"), and the Florida Private Sector Whistleblower Act, Fla. Stat. § 448.102, *et seq.* ("FPSWA") to redress injuries done to her by the Defendant, PRIME HEALTHCARE SERVICES-LEHIGH ACRES, LLC d/b/a LEHIGH REGIONAL MEDICAL CENTER ("Defendant").

2.    The unlawful acts which gave rise to this Complaint occurred within Lee County, Florida during the Plaintiff's employment with Defendant, making venue proper in this District pursuant to 28 U.S.C. § 1391.

## PARTIES

3.      At all times material hereto, Plaintiff has been a citizen and resident of Charlotte County, Florida and is otherwise *sui juris*.

4.      At the relevant time, Plaintiff was a woman, as such, Plaintiff is a member of a protected class under Title VII and Chapter 760 because the terms, conditions, and privileges of her employment were altered.

5.      As an individual with first amendment rights, Plaintiff is a member of a protected class under the FPSWA because the terms, conditions, and privileges of her employment were altered because Plaintiff voiced her objection to the illegal activities committed by the Defendant.

6.      The FPSWA provides that an employer may not take any retaliatory personnel action against an employee because the employee has: (1) disclosed, or threatened to disclose, to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation; (2) provided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer; (3) objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation.  § 448.102, Fla. Stat.

7.      Defendant is not a government agency. At all times material hereto, Defendant was Plaintiff's employer as defined by law.

8.      Defendant has, at all times material hereto, employed 15 or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year.

9.      Plaintiff has exhausted her administrative remedies by filing a timely charge of discrimination against the Defendant with the Equal Employment Opportunity Commission, which was dually filed with the Florida Commission on Human Relations.

10.     Plaintiff's charge was filed within 300 days after the first instance of discrimination occurred.

11.     Plaintiff was issued a Notice of Right to Sue on August 17, 2021. This suit is filed in accordance with that Notice and within the applicable ninety (90) day limitation (a copy of the Notice is attached hereto as Exhibit "A").

12.     The Florida Commission on Human Relations did not issue a finding on Plaintiff's charge within 180 days of the filing of said charge.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

13.     Defendant hired Plaintiff as an Intensive Care Unit Nurse on November 12, 2018.

14.     As an Intensive Care Unit Nurse, Plaintiff's primary duties and responsibilities included patient care, giving medications, taking orders, and communicating with doctors.

15.     Plaintiff was qualified for her position based on her experience and training.

16.     The Plaintiff found out she was pregnant around September 2018.

17.     Around January 2019, the Plaintiff's doctor gave her a note stating that she needed be on light duty. The Plaintiff showed the note to the charge nurses so they would be aware when giving the Plaintiff assignments.

18.     On February 18, 2019, Mr. John Pullaro began his position as the Critical Care Unit Manager for the Defendant and as Plaintiff's supervisor. Everything went well initially. Mr. Pullaro asked for the Plaintiff's opinion and suggestions frequently and she did not experience any difficulties getting along with him.

3

19.     Things changed after the Plaintiff told Mr. Pullaro that she had been placed on light duty by her doctor. Mr. Pullaro told the Plaintiff not to show her light duty restrictions to Human Resources because they would not allow her to work at all. The Plaintiff questioned Mr. Pullaro and showed him the policy. Mr. Pullaro did not look at the policy and instead said, "you know how good these policies are to Human Resources, just as good as your doctor's note."  He refused to consider the Plaintiff's light duty restrictions. Mr. Pullaro said, "pregnancy is not sickness, and you're willingly working two jobs, so don't even try to milk it." The Plaintiff was shocked by this comment and felt discriminated against. While the Plaintiff was pregnant, Mr. Pullaro would make inappropriate comments towards her. Once when the Plaintiff was giving a patient CPR, Mr. Pullaro said, "you shouldn't be climbing on a patient like that. That is how you got in this situation," referring to the Plaintiff's pregnancy. The Plaintiff was not on top of the patient but to their side.

20.     The Defendant's refusal to accommodate the Plaintiff's light duty status during her pregnancy is against the Defendant's own policy. Again, the Defendant, particularly Mr. Pullaro and the charge nurses were aware and provided with the doctor's orders.

21.     Ms. Diane Campbell, Registered Nurse, belittled and harassed the Plaintiff regularly. She made comments like, "you are just a child, we have been doing this since you were in your mom's womb."  On a daily basis, Ms. Campbell put down the Plaintiff and Nurse Laura and Nurse Sandy witnessed it on multiple different occasions. The Plaintiff reported her behavior to Mr. Pullaro more than once. Nurse Laura also reported her behavior to Mr. Pullaro. However, Mr. Pullaro ignored these complaints.

22.     The Plaintiff went on maternity leave in early April 2019 and gave birth on April 23, 2019.

4

23.     On June 4, 2019, the Plaintiff returned to work on the night shift.  The Plaintiff had pending education that she needed to complete. Despite this, Jason, Charge Nurse, floated the Plaintiff to the Progressive Care Unit ("PCU"). Employees were supposed to follow a rotation and the rotations are pre-assigned. It was Jason's turn to float, yet the Defendant sent the Plaintiff despite her having just returned from leave and needing to complete her pending education. Defendant frequently assigned Plaintiff to floating shifts when it was not her turn.

24.     On June 9, 2019, Defendant assigned the Plaintiff to float to Medical Surgical ("MS") despite the fact that it was Sharon Catchings a/k/a Shaz, Charge Nurse, turn to float. The Plaintiff objected to this out of schedule float change to Theresa, Charge Nurse.

25.     Somewhere between June 6, 2019 and June 15, 2019, Mr. Pullaro asked the Plaintiff if she was getting used to the night shift. The Plaintiff responded by saying, "It'll take time and I'll need to get used to it again."  Mr. Pullaro then said, "do you miss working with me?" This made the Plaintiff uncomfortable, so Plaintiff responded with only a polite smile. Mr. Pullaro then said that he would start coming in during the night shift. The Plaintiff responded by saying, "oh ok, cool." Mr. Pullaro responded, "well you don't seem too excited." He asked the Plaintiff if there had been any issues on the night shift. The Plaintiff replied, "it hasn't been fair as far as assignments and floating rotation goes. I always get floated and treated a bit unfairly, and I am never given an opportunity to even look at the assignment or floating rotations." Mr. Pullaro responded, "Please Rabel, stop. I don't like it when people use absolute terms. Don't ever use the term "always" or "never" when you're communicating with me." The Plaintiff apologized, saying, "I didn't mean to upset you, I'll be careful not to use such terms around you again." He said, "Stop, your sarcasm is not going to help. Don't act like you care about my feelings. Your sarcasm is the last thing I need to hear from you."  The Plaintiff left the premises shortly after.

After that incident the Plaintiff did her best to minimize her interactions with Mr. Pullaro to avoid his harassing and discriminatory treatment towards her.

26.     On June 10, 2019, Ms. Campbell put the Plaintiff on call.

27.     On June 12, 2019, the Defendant assigned Plaintiff to float to PCU, again not based on whose turn it was in the floating rotation.

28.     Sometime in June 2019, Mr. Pullaro asked the Plaintiff if she had been telling people that he was gay. The Plaintiff had not told anyone that Mr. Pullaro was gay and had no knowledge regarding Mr. Pullaro's sexual orientation.  Mr. Pullaro said, "I think you're a great nurse, but you will be better as a secretary, and you can take care of this." He then grabbed the Plaintiff's hand and put it on his genitals. The Plaintiff snatched her hand away and, since she was standing in front of the door, her hand hit the door and made a loud banging sound, which startled Mr. Pullaro into backing away. The Plaintiff tried to grab the door handle so she could leave, but Mr. Pullaro stopped her, saying, "stop, get a deep breath and compose yourself. This didn't happen and don't say anything to anyone about this." The Plaintiff shook her head and he exited first, then she went out right behind him. Fearful for her job, the Plaintiff did not tell anyone at that time. The Plaintiff attempted to tell Ms. Christine Dinan, Regional HR Director, in an email in August 2019. Ms. Dinan never followed up nor asked any questions.

29.     On June 13, 2019, the Plaintiff brought incomplete blood transfusion documentation to Mr. Pullaro's attention, but he did not respond.

30.     On June 14, 2019, the Plaintiff notified Mr. Pullaro that she would be staying late to complete her documentation. The next day, the Plaintiff emailed Mr. Pullaro regarding cross training for the ER but he did not respond. The Plaintiff followed up on June 18, 2019, via text message about her email regarding cross training. Again, Mr. Pullaro did not respond.

31.     On June 24, 2019, the Plaintiff went to Mr. Pullaro's office regarding an event that took place with a patient coding. The Defendant had a patient who was not maintaining the appropriate oxygen levels. There was an issue with the respiratory therapist not attending to the patient. The patient failed to communicate that with the Plaintiff. The patient began to code and medical staff had to resuscitate her. Mr. Pullaro assigned the Plaintiff to prepare an educational task for the whole unit on the topic of "how to care for intubated patients." The Plaintiff questioned Mr. Pullaro as to why she needed to do this task. He explained to the Plaintiff that she failed to call the provider despite having to manually bag a patient several times. The Plaintiff tried explaining to him that she was not aware that Tamara, RN, bagged the patient more than two times and that even the first time when she was bagging the patient, the Plaintiff was not notified. The Plaintiff just happened to walk in and see her bagging the Plaintiff's patient and asked her what was going on. She told the Plaintiff that she was having trouble bringing up the patient's oxygen saturation. The Plaintiff responded by stating, "Hmm, she doesn't have a lot of secretions." The day nurse told the Plaintiff that they also had trouble with that and they needed to start her on paralytics. As the Plaintiff was explaining it all to Mr. Pullaro, he kept cutting her off and telling her to stop arguing with him. He stated, "even if you had to bag the patient twice, you should've called the provider." The Plaintiff responded to Mr. Pullaro, "It's not uncommon having to bag a patient twice because sometimes the mucus plug doesn't necessarily get cleared the first time." He responded, "just stop talking Rabel, I am just providing you with constructive feedback."   The Plaintiff told Mr. Pullaro that she is very open to feedback and learning opportunities, but she doesn't appreciate when she feels like she is being punished and not given an opportunity to explain the situation. The Plaintiff walked out of Mr. Pullaro's office and texted him to ask if it was okay if she also included some educational material that would explain that

it's not uncommon for a patient on paralytics to get obstructed and that the obstruction can be cleared by manual bagging. Shortly after that text, Mr. Pullaro came to the unit and told the Plaintiff to come back to his office. The Plaintiff also saw Ms. Carolyn Gooden, Medical Surgical Manager, in his office. Mr. Pullaro started reading the Plaintiff's text message in a tone of a little girl with head bobbling gestures from side to side. The Plaintiff immediately requested that he stop and said, "why are you reading my message in this manner?" Mr. Pullaro responded, "because that's how I feel this message is, clever, being a smart ass." The Plaintiff asked to be excused from the meeting. The Plaintiff left his office in tears and texted Mr. Pullaro and asked if she could speak with him over the phone. Mr. Pullaro told the Plaintiff that he is in room 203 and will call her once he was free during his break. Mr. Pullaro called the Plaintiff during his break and asked him what the problem was.  The Plaintiff told Mr. Pullaro that she just wanted to work in a peaceful environment but was scared that she was going to lose her job because it appeared as if he was always upset with her. The Plaintiff told Mr. Pullaro that it seemed even her presence bothered him.  The Plaintiff also told him that she would do whatever tasks he wanted her to do, but she needed him to stop behaving this way towards her.

32.     The Plaintiff began going to greater lengths to avoid Mr. Pullaro and was scared to even look at him. At this point, Mr. Pullaro was coming in very early in the morning, well in advance of his scheduled shift, and finding a reason to speak with the Plaintiff. The Plaintiff kept her responses very short, limited, and only answered the questions he asked. The Plaintiff observed Mr. Pullaro just staring at her at times for no reason. The Plaintiff started doing whatever she could to limit her communications with Mr. Pullaro to emails and text messages.

33.     On June 26, 2019, the Plaintiff sent Mr. Pullaro an email explaining how much she wanted to get along with him because she believed she could learn from him. The Plaintiff also

told him that there were many improvements to be made on the night shift and that she would like to work with him to improve things. The Plaintiff mentioned that she felt very nervous and anxious talking to him in person due to their previous encounters.  Mr. Pullaro did not respond or acknowledge the Plaintiff's email.

34.     On June 29, 2019, the Defendant crossed out the Plaintiff's name on the schedule for July 4th and 5th without explanation. The Plaintiff asked Mr. Pullaro if he changed the schedule, and he denied it.

35.     Towards the end of June or early July 2019, the Plaintiff tried to speak with Ms. Jacklyn Nieves, Clinical Educator, about the problems she had been having with Mr. Pullaro. Ms. Nieves advised the Plaintiff to sit down with him and have a one on one conversation. The Plaintiff told Ms. Nieves that she was nervous to talk to Mr. Pullaro that way. The Plaintiff tried to tell her about the June 12, 2019 incident, but someone interrupted their conversation.

36.     A few days later, Ms. Nieves texted the Plaintiff and asked her if she would be interested in being assigned as Relief House Supervisor ("HSV"). The Plaintiff responded that she didn't mind doing it as needed. The Plaintiff also told Ms. Nieves that she had been asking Mr. Pullaro about cross training for the ER. The Plaintiff told her she would not need as much training as she had worked in the emergency room in the past.  Ms. Nieves told the Plaintiff that she would speak to Mr. Pullaro and get back to her. Ms. Nieves told the Plaintiff that she still needed to speak to Mr. Ken Sanger, Chief Nursing Officer. After speaking with Mr. Sanger, Ms. Nieves told the Plaintiff, "Rabel, Mr. Sanger does not have a very good impression of you anymore. I don't know what Mr. Pullaro said to him. I told Mr. Sanger that it's not true, so he is willing to go and talk to Mr. Pullaro when Mr. Pullaro gets back from his vacation."

37.     On July 15, 2019, the Plaintiff texted Mr. Pullaro to see if she was needed so that she could report to work. Mr. Pullaro told the Plaintiff to text Ms. Catchings as she was the house supervisor. The Plaintiff texted Ms. Catchings but she did not respond to the Plaintiff. Ms. Catchings called the Plaintiff later and asked her to come in. She made the Plaintiff take three patients from other nurses in addition to two new admissions. Because of the Defendant's delay in calling the Plaintiff to report for an on-call shift, Plaintiff was not able to obtain a complete history on the patients.  Plaintiff knew that this would negatively impact her subsequent report to the Defendant. Defendant had set up the Plaintiff to fail. When the Plaintiff tried to speak to Ms. Catchings, she was dismissive and then began to talk about the Plaintiff to others. Later on that day, Mr. Pullaro reported to work and immediately approached Ms. Catchings and asked her, "why did you feel the need to call her in?" The Plaintiff overheard his comment and she asked Ms. Catchings if there was a problem. Ms. Catchings said, "he asked me why I called you."

38.     Later, the Plaintiff spoke to Clara, the day supervisor, about the issue with Ms. Catchings. Clara told the Plaintiff to speak with Mr. Pullaro, but the Plaintiff told Clara she couldn't speak with Mr. Pullaro because he would get upset with her for complaining.

39.     The Defendant continued to assign the Plaintiff to float out of rotation.

40.     On July 10, 2019, the Plaintiff was scheduled for an on call shift, and Defendant called her in for two new admissions. In the morning Mr. Pullaro said that he needed to talk to the Plaintiff. Once the Plaintiff completed her documentation, she went to his office to speak with him and Ms. Susan Allen, Human Resources Director, was there unexpectedly. Ms. Allen told the Plaintiff that she needs to speak with her, additionally she told the Plaintiff, "Don't worry, you're not in trouble. I just want to talk to you." Ms. Allen and the Plaintiff went to her office, where she asked the Plaintiff many questions about how Mr. Pullaro had been treating her. The

Plaintiff also told Ms. Allen that Mr. Pullaro made her very nervous and she was scared to say anything to him. Ms. Allen assured the Plaintiff that she can tell her anything and it would be confidential and that she would be protected from any retaliation. Ms. Allen also assured the Plaintiff that, in the future, if Mr. Pullaro needed to speak with the Plaintiff, she would be present.

41.     On July 11, 2019, the Plaintiff asked Ms. Campbell if she could change her assignment due to patient safety. Ms. Campbell denied Plaintiff's request, saying, "quit your drama, nothing is going to change." The Plaintiff overheard Ms. Campbell tell Mr. Pullaro, "Rabel came in starting with her change the assignment drama again and I told her nothing is going to change. Don't worry, Human Resources is aware of her behavior."  The Plaintiff reported Ms. Campbell's comment to Ms. Allen via email. The Plaintiff also texted Mr. Pullaro to ask whether he felt she missed anything in her documentation on new admissions, but he did not respond.

42.     The Plaintiff was always the first to be tripled up for admission. Typically, in ICU, the nurse to patient ratio is two to one but the majority of the time the Plaintiff would have three or even four patients. That did not happen to anyone else.

43.     On July 18, 2019, Ms. Allen notified the Plaintiff that Ms. Catchings made a harassment complaint against Plaintiff. The Plaintiff's last communication with Ms. Catchings was on July 9, 2019 via text message.  Plaintiff provided that text exchange to Ms. Catchings along with   a voicemail left by Ms. Catchings on the Plaintiff's phone on July 7, 2019, during which Ms. Catchings referred to the Plaintiff as "love" which the Plaintiff found condescending.

44.     On July 19, 2019, Mr. Pullaro requested a meeting. Ms. Allen told the Plaintiff it was regarding a performance review which later turned out to actually be a write-up. The Plaintiff emailed her back and said that she felt that she was being retaliated against because she had

complained to Ms. Allen about Mr. Pullaro's discriminatory behavior on July 10, 2019.  Ms. Allen did not respond to the Plaintiff's email.

45.     Mr. Pullaro continued to berate the Plaintiff in front of others and speak to her in a condescending tone. There were other people making critical errors, yet the Defendant only singled out the Plaintiff.

46.     On July 22, 2019, Mr. Pullaro issued a write-up to the Plaintiff for incurring overtime on multiple days. Mr. Pullaro should not have written up the Plaintiff because she received permission to work the overtime hours she worked. The Defendant was not writing up others for "incidental overtime." Some of the days for which the Defendant wrote up the Plaintiff were days when the Plaintiff did not even work in Mr. Pullaro's unit, thus the overtime would not have been charged to his unit.  Also, on July 22, 2019, Mr. Pullaro verbally coached the Plaintiff for purportedly missing "Intake and Output" in her documentation. Mr. Pullaro wanted Intake and Output entered for every patient every hour, but the provider's orders required that this be entered every four hours. None of the other nurses were required to do this hourly. The Defendant issued the write-up and verbal coaching in retaliation for Plaintiff's complaint of discrimination on July 10, 2019.

47.     On July 23, 2019, the Defendant denied Plaintiff permission to come in and complete her assigned education. The Plaintiff was told to follow the hospital policy and not the provider's orders. In the meantime, Ms. Catchings was making the Plaintiff's work environment very hostile and difficult by arguing with the Plaintiff at the nurses' stations and in the patients' rooms. Ms. Catchings also manipulated the assignments. For example, Ms. Catchings would give the Plaintiff the more difficult patients and would float the Plaintiff to different units outside of the scheduled rotations.

48.     On July 24, 2019, the Plaintiff met with Ms. Allen.  Ms. Allen made excuses for Mr. Pullaro and told the Plaintiff that he was only trying to help her. The Plaintiff filed an official complaint of harassment and retaliation against Mr. Pullaro and Ms. Catchings.

49.     That same day, Ms. Gooden called the Plaintiff to come in and work MS and the Plaintiff agreed to do so.  Ms. Gooden then called the Plaintiff back and canceled, stating that they decided to call in Ms. Catchings instead. Ms. Catchings was incurring overtime by taking this shift, something for which the Defendant had just reprimanded the Plaintiff.

50.     The Plaintiff sent an email to Ms. Allen stating that Defendant denied her the opportunity to come to work and complete educational training, and also that if she had come to work that day, she would not have been incurring overtime, but that Ms. Catchings was incurring overtime.

51.     On July 26, 2019, the Plaintiff sent an email to Mr. Pullaro, Mr. Sanger, and Ms. Allen regarding some other nurses who were failing to accurately and completely meet their documentation obligations for patients. The Defendant did not address this issue with any of those nurses. That same day, Eddie, Charge Nurse, told the Plaintiff that Mr. Pullaro had instructed him that if someone had to be "tripled," meaning assigned to three patients, it had to be the Plaintiff.

52.     On July 27, 2019, Jason, House Supervisor, placed the Plaintiff on call.

53.     On July 28, 2019, the Plaintiff found an email in the printer initiated by Mr. Sanger to Mr. Pullaro. The email stated that the Plaintiff had been recommended to relief field supervisor. Mr. Pullaro mentioned in the email that there was a lot of drama pertaining to the Plaintiff and Human Resources. The Plaintiff gave the email to Ms. Allen. The Plaintiff also reported that Jason, Nurse, went through the Plaintiff's purse and read a journal she had. Jason then told Mr. Pullaro that the Plaintiff was writing down everything pertaining to work. Mr. Pullaro asked the

Plaintiff if she had any patient information in her journal and the Plaintiff told him she did not. The Plaintiff reported this to Human Resources.

54.     Another employee told Plaintiff that they saw Mr. Pullaro logged into the Plaintiff's email. In the ICU, one of the computers saves the passwords, and the Plaintiff had forgotten to log out, so Mr. Pullaro logged in as her. The Plaintiff requested the login statistics and history for her work email, but the Defendant did not provide them to her.

55.     Andrina Thomas, Staff Member, told the Plaintiff that Mr. Pullaro had instructed her to report the Plaintiff to Human Resources.

56.     On August 1, 2019, the Defendant placed the Plaintiff on call against rotation policy. In a text conversation with Mr. Pullaro, the Plaintiff asked him to stop targeting her and treating her this way. The Plaintiff again emailed Ms. Allen but she provided no assistance.

57.     On August 2, 2019, the Plaintiff filed an internal incident report regarding a new patient because both the emergency room and RT department had delayed the patient's care. That same morning, the quality manager accused the Plaintiff of not giving that same patient enough fluids. This accusation was unfounded because the Plaintiff was following the provider's order by not giving more than the specified amount of fluids.

58.     Later, the Plaintiff scheduled a meeting with Ms. Allen to discuss Mr. Pullaro and his constantly changing procedures. Ms. Allen rushed Plaintiff through her explanation and seemed disinterested. Once the Plaintiff finished her complaint, she waited for Ms. Allen to ask her questions.  Instead, Ms. Allen said there was something else she needed to discuss with Plaintiff. Ms. Allen was then joined by Ms. Sharlene Fischer, Risk Manager, and Mr. Greg Stephens, HIPAA Compliance Officer.  They then stated that they were there because they believed Plaintiff had violated HIPAA. After the Plaintiff responded to the purported HIPAA

14

violations, Ms. Allen told the Plaintiff that Defendant was placing her on paid suspension pending investigation. The Plaintiff said she felt that the accusations and e suspension were retaliatory. Shortly after the meeting the Plaintiff sent an email to Ms. Allen, but she never responded. The Plaintiff spoke to Mr. Sanger who said he would get back to the Plaintiff but never did.

59.     In the meantime, Defendant did not address Mr. Pullaro's discriminatory and retaliatory behavior that Plaintiff complained of on the same date.

60.     On August 3, 2019, the Plaintiff filed a complaint against Ms. Fischer, Mr. Stephens, and Ms. Gooden for the baseless accusations regarding HIPAA violations. The Plaintiff also emailed Mr. Gary Bell, CEO, and Mr. Sanger regarding the ongoing retaliation and harassment. Neither of them responded. The next day, the Plaintiff updated her complaint via the compliance hotline.

61.     On August 5, 2019, the Plaintiff received a response from compliance with follow up questions, which she answered.  The Plaintiff also left her name and contact number for someone to call her back because she did not feel comfortable talking to Ms. Allen given how things had been handled to that point.

62.     On August 9, 2019, the Plaintiff filed a retaliation complaint against Ms. Allen.

63.     During the suspension, Plaintiff sent emails and called regularly, but never received responses.

64.     Ultimately, towards the end of August, Defendant concluded that Plaintiff did not violate HIPAA and allowed her to return to work. It turned out that Plaintiff's suspension was in fact unpaid.

65.     After Plaintiff returned to work from her suspension, Mr. Pullaro's discriminatory and retaliatory behavior towards the Plaintiff intensified. Mr. Pullaro regularly came to work early

15

in order to ask Plaintiff's coworkers about her every action. He would come into a patient's room and reprimand Plaintiff for minor issues that did not impact patient care, and he did so in front of the patient.  He did not do this to other nurses.  Mr. Pullaro constantly watched the Plaintiff and publicly reprimanded her in the middle of the nurse's station. He did not do this to other nurses.

66.     Upon her return to work, the Plaintiff discovered that Defendant completely cleaned out her locker and removed her named from both her locker and her mail drop location. Defendant did not provide any explanation for this.

67.     Defendant cancelled Plaintiff's second post-suspension shift. Mr. Pullaro claimed that he cancelled the shift because she had not had a shift canceled in almost a month.  Of course, that was because she was not on the schedule at all due to Defendant's retaliatory suspension.

68.     The Plaintiff requested to be reconsidered for HSV relief. Mr. Sanger denied her request because she allegedly lacked the requisite qualifications and experience.  Mr. Sanger provided this explanation despite the fact that Defendant gave this opportunity to employees with the same or lesser qualifications and experience as the Plaintiff.

69.     On September 2, 2019, the Plaintiff emailed Human Resources to complain about Mr. Pullaro's harassing conduct and also to complain that Mr. Jason Sumicz was making fun of Indian peoples' accents.

70.     The Defendant ignored the Plaintiff's complaint regarding Mr. Sumicz. The Defendant closed the investigation regarding the Plaintiff's complaints relating to Mr. Pullaro, stating that "there was no evidence of harassment."

71.     On September 3, 2019, the Plaintiff reported Mr. Pullaro for a HIPAA violation when Mr. Pullaro emailed a patient's protected health information to the Plaintiff's personal email without encryption. Defendant suspended Mr. Pullaro with pay for three days.

72.     On or around September 10, 2019, the Plaintiff reported the Defendant to Florida's Agency for Health Care Administration ("AHCA") and the Joint Commission for violations of multiple rules and regulations related to patient safety concerns. Plaintiff previously reported these patient safety concerns to Mr. Pullaro, but he did not address them. Specifically, the Plaintiff reported excessive restraint use in ICU and the Defendant's issuance of false documentation to justify the use of restraints. The Plaintiff also reported the Defendant to the Department of Labor's Wage and Hour Division because Defendant required employees to clock out even when the employees did not take a break.

73.     On September 11, 2019, the Defendant cancelled the Plaintiff's shift without justification.

74.     On September 12, 2019, the Plaintiff spoke to Mr. Gus Mondragon, House Supervisor, about the incident that had occurred with Mr. Pullaro when he put the Plaintiff's hand on his genitals. The Plaintiff asked Mr. Mondragon if he thought that the Plaintiff should speak to a psychiatrist about it and he said yes.

75.     On September 13, 2019, without the Plaintiff's knowledge, Mr. Mondragon reported the sexual harassment incident to Ms. Christine Dinan, Regional Human Resources Director. The Plaintiff sent an email to Ms. Dinan complaining about Mr. Pullaro's discriminatory behavior and advances towards her. She also provided copies of text messages from Mr. Pullaro supporting her complaint. Ms. Dinan failed to take any action with respect to the Plaintiff's complaint.

76.     On September 13, 2019, the Plaintiff filed a retaliation complaint against Mr. Sanger because Mr. Sanger was not responding to the Plaintiff's emails, and she found out that Mr. Sanger had blocked her number, so she was unable to reach him by phone.

77.     Around that same time, the Plaintiff filed a verge report because a patient was found unresponsive. A day or two prior the Plaintiff notified the risk manager regarding multiple patients who had orders for continued oxygen monitoring but were not being monitored due to lack of equipment.

78.     On September 16, 2019, the Plaintiff went to see Ms. Allen for a scheduled meeting regarding her complaint against Mr. Sanger. After spending only a few minutes discussing the Plaintiff's complaint, Ms. Allen switched to a harassment complaint filed against the Plaintiff by Tess Agnet, Staff RN and one of Mr. Pullaro's friends. Then, Mr. Sanger, Mr. Stephens, and Ms. Fischer joined the Plaintiff and Ms. Allen in her office to once again accuse the Plaintiff of HIPAA violations. The second allegation of HIPAA violations arose when Mr. Gus Mondragon, House Supervisor, assigned the Plaintiff to assist him with chart audits. Aside from the authorized access based on Mr. Mondragon's assignment, the Plaintiff accessed the patients' charts the prior night during her shift when she worked with those patients. It is common practice for nurses to return to a patient's chart to complete the necessary documentation. Despite this, the Defendant suspended the Plaintiff a second time.

79.     On September 18, 2019, the Plaintiff asked Mr. Mondragon to send her an email to confirm that he had in fact delegated the chart audit task to her. Mr. Mondragon sent the Plaintiff that email and Plaintiff provided a copy to Defendant, but that was not enough to resolve Defendant's accusations. Instead, the very next day, the Defendant suspended Mr. Mondragon.

80.     On September 24, 2019, the Plaintiff met with Ms. Sharon Han, assistant attorney for the Defendant, for a three-hour long interview, during which Ms. Han asked the Plaintiff questions about the sexual harassment incident with Mr. Pullaro.

18

81.     On September 25, 2019, the Plaintiff again met with Ms. Han to continue her interview.

82.     On September 26, 2019, the Plaintiff met with an EEOC investigator to file her charge of discrimination. Shortly, after the Plaintiff filed her EEOC charge, Ms. Han repeatedly requested that the Plaintiff voluntarily surrender custody of her personal phone for "forensic analysis." The Plaintiff refused but Ms. Han insisted that she could not conclude the investigation unless Plaintiff provided her personal phone. Ms. Han also told the Plaintiff that Defendant had completed the HIPAA investigation but that it would not release the outcome because the Plaintiff made "new allegations."

83.     In October 2019, the Plaintiff learned that Ms. Allen and Mr. Pullaro no longer worked for Defendant.

84.     On or about November 11, 2019, the Defendant's new Human Resources Director notified Plaintiff that Defendant concluded the investigation regarding the alleged HIPAA violations and that Defendant was terminating the Plaintiff's employment.

85.     The Plaintiff filed an Amended charge of discrimination with the EEOC on April 14, 2020.

86.     Plaintiff has engaged the undersigned attorney to prosecute her claims and is entitled to recover her attorney's fees from Defendant pursuant to statute.

## COUNT 1: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (Discrimination on the Basis of Gender)

87.     Plaintiff incorporates herein the allegations contained in paragraphs 1 through 86, inclusive, as though same were fully re-written here.

88.     Plaintiff brings this action under Title VII for damages caused by Defendant's unlawful employment practices committed against Plaintiff because Defendant discriminated against Plaintiff on the basis of her gender, female.

89.     Mr. Pullaro, Ms. Campbell, Ms. Catchings, Mr. Sanger, Ms. Allen, Ms. Gooden, Ms. Fischer, Mr. Stephens, Mr. Bell, Ms. Dinan, and Ms. Han, at all times relevant, were acting within the course and scope of their employment for Defendant.

90.     Because Plaintiff is a woman, she was discriminated against by management, and the Defendant refused to take any action to prevent the discrimination.

91.     Upon information and belief, male employees who are similarly situated in all material respects are not treated in the same manner as Defendant treated Plaintiff.

92.     Upon information and belief, male employees who are similarly situated in all material respects are not permitted to be harassed by management.

93.     Upon information and belief, the Defendant takes seriously the complaints of male employees who are similarly situated in all material respects.

94.     Defendant engaged in unlawful employment practices in violation of Section 703(a)(1) of Title VII, 42 USC §2000e2(a)(1) which resulted in Defendant discriminating against Plaintiff.

95.     Plaintiff is entitled to such affirmative relief as may be appropriate, including but not limited to, lost wages, benefits, and compensation for emotional distress pursuant to the provisions of Title VII of the Civil Rights Act of 1964, §706(g).

96.     Plaintiff, based on information and belief, alleges that Defendant's actions were done with malice, and with disregard for her protected rights under Title VII. Defendant, by and through its officers, and/or supervisors, authorized, condoned, and/or ratified the unlawful conduct

of its employees. Therefore, Plaintiff is also entitled to punitive damages from Defendant in an amount to be determined at trial.

WHEREFORE, Plaintiff hereby requests that this Court grant Plaintiff judgment against Defendant to compensate her for past and future pecuniary losses, including back pay, front pay, lost benefits, compensatory damages, injury to her professional reputation, emotional pain and suffering for the embarrassment, anxiety, humiliation, and emotional distress caused by Defendant's discriminatory treatment, and punitive damages in an amount to be determined at trial and in accordance with Title VII of the Civil Rights Act of 1964, §706(g); attorney's fees, costs, prejudgment and post judgment interest, and such other and further relief as the Court deems just and appropriate.

## COUNT II: VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT OF 1992
### (Discrimination on the Basis of Gender)

97.    Plaintiff incorporates herein the allegations contained in paragraphs 1 through 86, inclusive, as though same were fully re-written here.

98.    The FCRA forbids discrimination on the basis of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status and thereby to protect their interest in personal dignity, to make available to the state their full productive capacities, to secure the state against domestic strife and unrest, to preserve the public safety, health, and general welfare, and to promote the interests, rights, and privileges of individuals within the state.

99.    Plaintiff is a woman, and therefore a member of a protected class.

100.    Mr. Pullaro, Ms. Campbell, Ms. Catchings, Mr. Sanger, Ms. Allen, Ms. Gooden, Ms. Fischer, Mr. Stephens, Mr. Bell, Ms. Dinan, and Ms. Han, at all times relevant, were acting within the course and scope of their employment for Defendant.

101.    Because Plaintiff is a woman, she was discriminated against by management, and the Defendant refused to take any action to prevent the discrimination.

102.    Upon information and belief, male employees who are similarly situated in all material respects are not treated in the same manner as Defendant treated Plaintiff.

103.    Upon information and belief, male employees who are similarly situated in all material respects are not permitted to be harassed by management.

104.    Upon information and belief, the Defendant takes seriously the complaints of male employees who are similarly situated in all material respects.

105.    At all relevant and material times, Defendant failed to comply with the FCRA.

106.    At all times relevant, including at the time of the unlawful and discriminatory treatment, Defendant was aware that Plaintiff was a woman.

107.    At the time of the unlawful discrimination, Plaintiff did perform and excel at the performance of the essential functions assigned to her by the Defendant.

108.    The failure of Defendant to adhere to the mandates of the FCRA was willful and its violations of the provisions of the FCRA were willful.

109.    Defendant, through its practices and policies as an employer, willfully, and with malicious or reckless disregard of Plaintiff's protected rights, discriminated against Plaintiff on account of her being a woman in violation of the FCRA with respect to its decision to treat Plaintiff differently from other employees.

110.    Defendant's treatment of Plaintiff was directly and proximately caused by Defendant's unjustified discrimination against Plaintiff because she is a woman, in violation of the FCRA.

111.     Any allegedly nondiscriminatory reason for the treatment of Plaintiff asserted by Defendant is a mere pretext for the actual reasons for the treatment; namely, Plaintiff being a woman. Defendant's actions were malicious and were recklessly indifferent to Plaintiff's rights protecting persons from discrimination due to her sex. The discrimination on the basis of sex constitutes unlawful discrimination.

112.     As a direct and proximate result of Defendant's intentional conduct, Plaintiff has suffered serious economic losses, as well as mental pain and suffering.

WHEREFORE, Plaintiff hereby requests this Court grant Plaintiff judgment against Defendant to compensate her for all past and future pecuniary losses, including back pay, front pay, lost benefits, compensatory damages, injury to her professional reputation, emotional pain and suffering for the embarrassment, anxiety, humiliation, and emotional distress caused by Defendant's discriminatory treatment, and punitive damages in an amount to be determined at trial and in accordance with the FCRA; attorney's fees, costs, prejudgment and post judgment interest, and such other and further relief as the Court deems just and appropriate.

## COUNT III: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (Retaliation)

113.     Plaintiff incorporates herein the allegations contained in paragraphs 1 through 86, inclusive, as though same were fully re-written here.

114.     Plaintiff had the right to voice her grievances to the Defendant regarding the fact that she was being discriminated against.

115.     When Defendant suspended the Plaintiff twice and then terminated the Plaintiff, it retaliated against Plaintiff for exercising her rights.

116.    Mr. Pullaro, Ms. Campbell, Ms. Catchings, Mr. Sanger, Ms. Allen, Ms. Gooden, Ms. Fischer, Mr. Stephens, Mr. Bell, Ms. Dinan, and Ms. Han, at all times relevant, were acting within the course and scope of their employment for Defendant.

117.    Plaintiff is entitled to such affirmative relief as may be appropriate, including, but not limited to, lost wages, benefits, and compensation for emotional distress, pursuant to the provisions of Title VII of the Civil Rights Act of 1964.

118.    Upon information and belief, Defendant's unlawful employment practices were done with malice or with reckless indifference to the protected rights of Plaintiff. Defendant, by and through its officers and/or supervisors, authorized, condoned, and/or ratified the unlawful conduct of those in direct contact with Plaintiff. Therefore, Plaintiff is also entitled to punitive damages from Defendant in a sum to be determined at trial.

WHEREFORE, Plaintiff hereby requests this Court declare that Defendant's suspension and termination of Plaintiff was unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, grant Plaintiff judgment against Defendant to compensate her for all past and future pecuniary losses, including back pay, front pay, lost benefits, compensatory damages, injury to her professional reputation, emotional pain and suffering for the embarrassment, anxiety, humiliation, and emotional distress caused by Defendant's discriminatory treatment, and punitive damages in an amount to be determined at trial and in accordance with Title VII; attorney's fees, costs, prejudgment and post judgment interest, and such other and further relief as the Court deems just and appropriate.

## COUNT IV: VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT OF 1992
### (Retaliation)

119.    Plaintiff incorporates herein the allegations contained in paragraphs 1 through 86 inclusive, as though same were fully re-written here.

120.     Plaintiff had the right to voice her grievances to the Defendant regarding the fact that she was being discriminated against.

121.     When Defendant suspended the Plaintiff twice and then terminated the Plaintiff, it retaliated against Plaintiff for exercising her rights.

122.     Mr. Pullaro, Ms. Campbell, Ms. Catchings, Mr. Sanger, Ms. Allen, Ms. Gooden, Ms. Fischer, Mr. Stephens, Mr. Bell, Ms. Dinan, and Ms. Han, at all times relevant, were acting within the course and scope of their employment for Defendant.

123.     Plaintiff is entitled to such affirmative relief as may be appropriate, including, but not limited to, lost wages, benefits, and compensation for emotional distress, pursuant to the provisions of the FCRA.

124.     Upon information and belief, Defendant's unlawful employment practices were done with malice or with reckless indifference to the protected rights of Plaintiff. Defendant, by and through its officers and/or supervisors, authorized, condoned, and/or ratified the unlawful conduct of those in direct contact with Plaintiff. Therefore, Plaintiff is also entitled to punitive damages from Defendant in a sum to be determined at trial.

WHEREFORE, Plaintiff hereby requests this Court declare that Defendant's suspension and termination of Plaintiff was unlawful retaliation in violation of the FCRA, grant Plaintiff judgment against Defendant to compensate her for all past and future pecuniary losses, including back pay, front pay, lost benefits, compensatory damages, injury to her professional reputation, emotional pain and suffering for the embarrassment, anxiety, humiliation, and emotional distress caused by Defendant's discriminatory treatment, and punitive damages in an amount to be determined at trial and in accordance with the FCRA; attorney's fees, costs, prejudgment and post judgment interest, and such other and further relief as the Court deems just and appropriate.

## COUNT V: VIOLATION OF THE FLORIDA
## PRIVATE SECTOR WHISTLEBLOWER ACT

125.   Plaintiff incorporates herein the allegations contained in paragraphs 1 through 86, inclusive, as though same were fully re-written here.

126.   The FPSWA provides that an employer may not take any retaliatory personnel action against an employee because the employee has: (1) disclosed, or threatened to disclose, to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation; (2) provided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer; (3) objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation. § 448.102, Fla. Stat.

127.   Plaintiff objected to and reported to the appropriate governmental agencies the Defendant's violations of a law, rule, or regulation.

128.   At all times relevant, including at the time of the unlawful suspension and termination, Defendant was aware that Plaintiff had objected to the illegal activities committed by the Defendant.

129.   At the time of the unlawful suspension and termination, Plaintiff did perform and excel at the performance of the essential functions assigned to her by the Defendant.

130.   Plaintiff was qualified for the position and Defendant only suspended and terminated Plaintiff in retaliation for her objection to the illegal activities committed by the Defendant.

131.   Defendant is a sophisticated employer who has knowledge of the FPSWA.

132.   The failure of Defendant to adhere to the mandates of the FPSWA was willful.

26

133.    Defendant, through its practices and policies as an employer, willfully, and with malicious or reckless disregard of Plaintiff's protected rights through the State of Florida, retaliated against Plaintiff on account of her objecting to and/or reporting the illegal activities committed by the Defendant in violation of the FPSWA with respect to Defendant's decision to suspend and terminate the Plaintiff.

134.    Plaintiff's suspension and termination from employment was directly and proximately caused by Defendant retaliating against the Plaintiff for objecting to and/or reporting the illegal activities committed by the Defendant.

135.    Defendant's actions were malicious and were recklessly indifferent to Plaintiff's rights protecting persons from retaliatory actions when objecting to and/or reporting the illegal activities committed by the Defendant.

136.    As a direct and proximate result of Defendant's intentional conduct, Plaintiff has suffered economic losses including back pay, front pay, and compensatory damages for Defendant's violation of the FPSWA.

137.    Pursuant to the FPSWA, Plaintiff is entitled to recover her costs of this action and reasonable attorney's fees.

WHEREFORE, Plaintiff hereby requests that this Court grant Plaintiff judgment against Defendant to include  reinstatement of Plaintiff to the same, or an equivalent, position held before Defendant's retaliatory action against Plaintiff;  as well as reinstatement of full fringe benefits and seniority rights to Plaintiff; and compensation for past and future pecuniary losses, including back pay, front pay, lost benefits, compensatory damages, injury to her professional reputation, emotional pain and suffering for the embarrassment, anxiety, humiliation, and emotional distress caused by Defendant's discriminatory treatment, and punitive damages in an amount to be

determined at trial; attorney's fees, costs, prejudgment and post judgment interest, and such other

and further relief as the Court deems just and appropriate

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 15th day of September, 2021

By:  /s/ *Michelle Cohen Levy*
Michelle Cohen Levy, FBN 0068514
The Law Office of Michelle Cohen Levy, P.A.
4400 N. Federal Highway
Lighthouse Point, Florida 33064
P: (954) 651-9196
Michelle@CohenLevyLegal.com
Counsel for Plaintiff

28